UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| GALE FORCE NINE LLC,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>WIZARDS OF THE COAST LLC,<br><br>　　　　　Defendant. | CASE NO. 2:20-cv-01700-BAT<br><br>**REPORT AND RECOMMENDATION** |

Before the Court is Plaintiff Gale Force Nine, LLC's ("GF9") Motion for Temporary Restraining Order. Dkt. 4.[1] GF9 seeks an order restraining Defendant Wizards of the Coast LLC ("Wizards") from terminating the parties' February 22, 2017 Merchandise Licensing Agreement ("MLA"). Dkt. 4. GF9 asks that the restraining order remain in effect until trial and a final decision by the Court. *Id.* Wizards opposes the motion. Dkt. 18. Having reviewed and considered the filings of the parties, the undersigned recommends that the motion be denied.

I. BACKGROUND

A.　Dungeons & Dragons

Dungeons & Dragons is the world famous and industry leading tabletop role-playing game where players create characters and embark on imaginary adventures in a fantasy setting. Dkt. 19, Declaration of Ann Earp ("Earp Decl.") ¶ 3. The leader of the game, also known as the

---

[1] The prior Report and Recommendation (Dkt. 9) and Order denying this motion (Dkt. 11) were rescinded on November 20, 2020. Dkt. 12.

REPORT AND RECOMMENDATION - 1

Dungeon Master, relies on three core books to guide the game. *Id*. These core books—the Player's Handbook, Dungeon Master's Guide, and the Monster Manual—provide the central content on which games are based. Players can also purchase additional rulebooks, campaign guides, and adventure modules to use in their games. *Id*. Over 40 million people play Dungeons & Dragons across the globe, including many non-English speakers. *Id*. at ¶ 5.

Wizards is the publisher of Dungeons & Dragons, as well as other popular games and gaming products. It owns the intellectual property in Dungeons & Dragons, including copyrights in the Player's Handbook, Dungeon Master's Guide, and Monster Manual. Dkt. 19, Earp Decl., at ¶ 4; Dkt. 20, Declaration of Dan Barrett ("Barrett Decl.") ¶ 24, Exs. 6 & 7. Wizards has also trademarked "Dungeons & Dragons" when used with game equipment and the distinctive dragon ampersand used on its products. Dkt. 20, Barrett Decl. ¶ 13 & 18, Exs. 1-4; Dkt. 19, Earp Decl. ¶ 4. Wizards' Dungeons & Dragons game is also recognizable by its red box design and other visual brand markers. Dkt. 20, Barrett Decl. ¶¶ 14-16; Dkt. 19, Earp Decl. ¶ 4.

B.  Contract with GF9

On February 22, 2017, Wizards entered into a licensing agreement with GF9 to assist Wizards in reaching its international fans and customers. Dkt. 5, Declaration of John-Paul Brisigotti at Ex. A ("MLA"). Under the MLA, Wizards granted GF9 the right to translate, and an exclusive right to manufacture, publish, market, sell, and distribute certain Wizards Dungeons & Dragons products in specified international markets (the "Licensed Products"), subject to GF9's compliance with the terms of the MLA. *Id*. at 1; Dkt. 19, Earp Decl. ¶ 7.

The MLA contains several provisions requiring GF9's Licensed Products to meet Wizards' quality standards. Section 7 of the MLA provides that Dungeons & Dragons products translated, manufactured, published, marketed, sold, or distributed by GF9 "shall be of

REPORT AND RECOMMENDATION - 2

acceptable quality that satisfies consumer expectations, making them merchantable and fit for their intended and foreseeable uses," and "of such style and appearance as to be appropriate for and suited to their exploitation to the best advantage and to the protection and enhancement of" the Dungeons & Dragons products. Dkt. 5, Ex. A (MLA § 7). GF9 warranted in the contract that its products would be "of the same standards of quality, or better, as [GF9's] current products." *Id*. In Section 4 of the MLA, GF9 acknowledged:

> that a breach by [GF9] of any of its covenants, agreements or undertakings with respect to use of the Licensed Property, legal marking requirements, quality standards or ethical standards will cause [Wizards] irreparable damage, which cannot be readily remedied in damages in an action at law, and may, in addition thereto, constitute an infringement of [Wizards'] intellectual property rights to the Licensed Property, entitled [Wizards] to equitable remedies, costs and reasonable attorney's fees.

Dkt. 5, Ex. A (MLA § 4). The MLA also provides for Wizards' continued ownership and control of all intellectual property licensed to GF9 for use in the creation and manufacture of licensed products. Section 8 of the MLA details the intellectual property requirements, including that all licensed products be labeled with Wizards' intellectual property notices; that "All right, title and interest in and to all copyrights and trademarks embodying the Licensed Property or derived from the creation, manufacture or sale by the Licensee of the Licensed Articles, and all copyright and trademark registrations based thereon, shall be in Licensor's name and shall be owned exclusively by Licensor," with GF9 disclaiming any interest in the intellectual property except through the contract; and that GF9 "agrees not to utilize the Licensed Property or any other intellectual property of Licensor except as expressly permitted." *Id.* § 8.

C.      Notice of Breach of MLA

Section 20 of the MLA permits GF9 to "utilize a third-party" to manufacture and produce the Licensed Products but prohibits GF9 from outsourcing its rights or duties under the

REPORT AND RECOMMENDATION - 3

MLA. Dkt. 5, Ex. A (MLA § 20). If GF9 uses a third party, the MLA emphasizes that GF9 "shall remain primarily obligated under all provisions of this Agreement." *Id*.; Dkt. 19, Earp Decl. ¶ 7.

GF9's responsibility for the actions of its contractors is a key issue in this case, as Wizards contends that GF9 has breached the MLA in relation to GF9's business dealings with its subcontractors in Korea (TRPG Club) and in France (Black Book Editions). On November 9, 2020, Wizards sent a written notice of breach ("Notice of Breach") to GF9, setting forth violations by these subcontractors and asking that GF9 cure the violations:

*TRPG Club*

> Gale Force contracted TRPG Club to translate licensed articles into Korean and distribute the translated products in Korea. Wizards became aware of complaints from consumers, including on online forums, that the products published by TRPG Club were of low quality, including that the translations were poorly done and included inaccurate, missing, and offensive translations. Wizards conducted an independent assessment of TRPG Club's translations and verified the low quality of the published product. In addition, TRPG Club failed to provide adequate customer service to consumers of Dungeons & Dragons materials it translated and distributed. Customers complained of damaged books and orders that never arrived. These problems violate the Merchandise and Manufacturing Standards of the 2017 Agreement, and Gale Force is responsible for that breach.
>
> Gale Force's breach of the 2017 Agreement violates its obligations relating to merchandise and manufacturing standards; accordingly, Gale Force must completely cure this breach to Wizards' satisfaction within ten days of receipt of this notice under Section 12(c).

*BBE*

> Gale Force contracted BBE to translate licensed articles into French and distribute the translated products. After preparing French translations of the licensed articles as work-for-hire for Wizards, BBE republished the translated products under the brand "Heros & Dragons," copying and selling Wizards' intellectual property for its own benefit. BBE also developed, marketed, and sold products utilizing branding that infringes and unfairly competes with Wizards trademark- and copyright-protected content. Wizards has informed Gale Force that BBE's actions violate the 2017 Agreement and Gale Force's obligations under that contract, but Gale Force has failed to curb BBE's infringing uses of Wizards' intellectual property.

REPORT AND RECOMMENDATION - 4

> Under Section 12(d) of the 2017 Agreement, Wizards shall have the right to terminate Gale Force unless Gale Force completely cures this violation to Wizards' satisfaction within fifteen days after receipt of this notice, which, at a minimum, must include the removal from the market and destruction of all infringing BBE products and content, a full accounting from BBE of its revenue from such activities, and agreement from BBE to not reintroduce such content.

Dkt. 5, Brisigotti Decl., Ex. D.

In response to the Notice of Breach, GF9 filed its Complaint for breach of contract and breach of the implied duty of good faith and fair dealing. Dkt. 1. GF9 asserts that it is entitled to monetary damages in excess of $950,000.00, a declaratory judgment that it has not breached the MLA, and a permanent injunction restraining Wizards from terminating the MLA. *Id.* Two days after it filed its Complaint, GF9 filed the instant motion, seeking to restrain Wizards from terminating the MLA based on the violations identified in the Notice of Breach. Dkt. 4.

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 65, a district court may grant a temporary restraining order or preliminary injunction to prevent "immediate and irreparable injury." Fed. R. Civ. P. 65(b)(1)(A). *See also* Local Rules W.D. Wash. LCR 65(b). The purpose of a temporary restraining order is to preserve the status quo before a preliminary injunction hearing may be held; its provisional remedial nature is designed merely to prevent irreparable loss of rights prior to judgment. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). The legal standard that applies to a motion for a temporary restraining order is the same as a motion for a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001).

A temporary restraining order is an "extraordinary remedy never awarded as of right." *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015) (citation & internal quotation marks omitted). A court may issue a temporary restraining order only if the party seeking one carries its

REPORT AND RECOMMENDATION - 5

burden of proving all four elements of a demanding standard: "(1) a likelihood of success on the merits, that (2) it is likely to suffer irreparable harm in the absence of preliminary relief, that (3) the balance of hardships tips in its favor, and (4) that the public interest favors an injunction." *Riverside Publ'g Co. v. Mercer Publ'g LLC*, 2011 WL 3420421, at *3 (W.D. Wash. Aug. 4, 2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). While the Ninth Circuit recognizes an alternative, more flexible approach where the hardships "sharply" favor the moving party, *see All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011), this "'serious questions' approach supports a court's entry of a TRO only so long as the moving party also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Almeida v. Barr*, 452 F. Supp. 3d 978, 985 (W.D. Wash. 2020).

## III. DISCUSSION

A.     Irreparable Injury

*Winter* dictates that a plaintiff may not obtain a preliminary injunction unless it can show that irreparable harm is likely to result in the absence of the requested injunction. GF9 must show itself to be "under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 (9th Cir. 2011) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)). "[S]peculative injury does not constitute irreparable injury[,]" *Colorado River Indian Tribes v. Parker*, 776 F.2d 846, 849 (1985), and "[m]ere financial injury ... will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation." *Goldie's Bookstore, Inc. v. Superior Court of the State of Cal.*, 739 F.2d 466, 471 (9th Cir. 1984).

GF9 has not convinced this Court that the restraining order it seeks would prevent immediate and irreparable injury. GF9 asserts that termination of the MLA at this time will result in "substantial monetary injury, including but not limited to, the profit it would have earned through the remaining term of the MLA." Dkt. 4, p. 8; Dkt. 5, Brisigotti Decl. ¶ 33. Mere financial injury however, does not constitute irreparable harm. *See Sampson v. Murray*, 415 U.S. 61 (1974); *Goldie's Bookstore*, 739 F.2d at 471; *Mirina Corp. v. Marina Biotech*, 770 F. Supp. 2d 1153, 1162 (W.D. Wash. 2011) ("lost sales or business opportunities cannot constitute an irreparable harm, because . . . even if they were difficult to calculate, they would still constitute monetary, measurable damages").

GF9 also contends that its contractual relationships with its distribution partners will be damaged. Dkt. 5, pp. 8-9. However, in its Complaint, GF9 seeks over $950,000.00 if the MLA is terminated one year earlier than its current contract expiration date. GF9's CEO also described the parties' contract disputes in purely monetary terms:

> GF9 and Wizards engaged in further negotiations to try and reach an agreement, but GF9 was unwilling to accept an early end to the Agreements without adequate compensation, which Wizards refused to provide.

Dkt. 5, Brisigotti Decl., ¶ 29. Presumably, such negotiations and "adequate compensation" would have included an amount for any loss of business with GF9's distribution partners.

GF9 next argues that it will risk litigation from its subcontractors if Wizards terminates the MLA, which in turn would influence GF9 to terminate contracts with third parties. Dkt. 4, p. 9. This contention is conclusory and a speculative statement of injury. These third-party contracts are not in evidence and GF9 has provided no details as to their terms or scope. On the other hand, GF9 has provided facts to suggest that its relationships with these subcontractors is not exclusive to the handling of Wizards' products because it handles "other non-Wizards

REPORT AND RECOMMENDATION - 7

licensed products, such as Dune, Dr. Who, Star Trek and others." Dkt. 4, p. 9. In addition, GF9's template translation contract includes a provision permitting GF9 to terminate its agreements if it loses a license. Dkt. 19, Earp Decl. ¶ Ex. 4 at § 10.1.1. Moreover, these potential future injuries, assuming they occur and can be proven, are also compensable with money damages and therefore, do not constitute irreparable harm. *See*, *Mirina Corp.*, 770 F. Supp. 2d at 1162.

GF9 also asserts that it would be "forced to quickly terminate 90-100" of its 196 employees if Wizards terminates the MLA. Dkt. 5, Brisigotti Decl., ¶ 38. GF9 does not explain how it reached this figure or why these layoffs from the loss of business under the MLA would differ from any scenario where lost business under a contract results in either downsizing or redirection of employees. GF9 does not explain how it would retain these employees when the MLA expires by its terms in 2021.[2] Moreover, "a rule that any monetary loss that might induce a party to lay off employees constitutes irreparable harm… would threaten to swallow the rule that monetary damages are not sufficient to support preliminary injunctive relief." *Facebook, Inc. v. BrandTotal Ltd.*, No. 20-CV-07182-JCS, 2020 WL 6562349, at *10 (N.D. Cal. Nov. 9, 2020). Thus, courts regularly reject assertions of irreparable harm based on the need to lay off employees. *Am. Cargo Transp., Inc. v. United States*, No. C05-393JLR, 2005 WL 8172501, at *2 (W.D. Wash. Mar. 22, 2005) (no irreparable harm despite argument that plaintiff would "potentially need to lay-off crew members," where harm was speculative); *ADM Milling Co. v. Columbia Plateau Producers, L.L.C.*, No. 2:20-CV-0343-TOR, 2020 WL 5802344, at *5 (E.D.

---

[2] The cases relied on by GF9 for the proposition that laying off employees is cognizable as irreparable harm involved organizational plaintiffs whose members faced irreparable injury absent a TRO in the form of lost social services. *See* Dkt. 4, at 10 (citing *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 328 F. Supp. 3d 1133, 1150 (E.D. Wash. 2018); *Doe v. Trump*, 288 F.Supp.3d 1045, 1061-62 (W.D. Wash. 2017), *reconsideration denied*, 284 F.Supp.3d 1182 (W.D. Wash. 2018)).

REPORT AND RECOMMENDATION - 8

Wash. Sept. 29, 2020) ("no irreparable harm where there are only conclusory and speculative statements of injury," including as to "employee layoffs").

GF9 further asserts, based on a single conclusory statement, that termination of the MLA will cause "GF9's reputation and goodwill in the industry [to] be immediately irreparably damaged" Dkt. 4, p. 8. "Evidence of loss of control over business reputation and damage to goodwill [can] constitute irreparable harm," so long as there is concrete evidence in the record of those things. *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc*.,736 F.3d 1239, 1250 (9th Cir. 2013). Here, GF9 presents no actual evidence of that damage and therefore, the Court cannot evaluate this intangible harm. *See*, *Cloanto Corp. v. Hyperion Entm't CVBA*, 2019 WL 1489185, at *2 (W.D. Wash. Apr. 3, 2019) ("Irreparable harm will not be presumed where [the plaintiff] presents no proof beyond speculation that its reputation or goodwill in the market will be damaged, because the Court has no way of evaluating this intangible harm."); *see also Church of Scientology of Calif. v. U.S.*, 920 F.2d 1481, 1489 (9th Cir. 1990) ("a mere conclusory allegation of reputational harm" cannot demonstrate irreparable harm).

In sum, the undersigned finds that an award of damages in the form of a money judgment would be an adequate remedy for termination of the MLA. As illustrated by GF9's willingness to agree to the early termination of the MLA in exchange for a sufficient amount of money, this dispute is a routine contract dispute that does not warrant the extraordinary judicial interference requested. Because GF9 has failed to make a clear showing that it is likely to suffer irreparable harm absent the requested temporary restraining order, it is not entitled to the relief it seeks. Nevertheless, the undersigned has evaluated the remaining elements.

B.       <u>Likelihood of Success on the Merits</u>

GF9 bases its claim for a temporary restraining order on the merits of Wizards' Notice of Breach and its intent to terminate the MLA based on the breaches identified in the Notice of Breach. Dkt. 4, pp. 10-15. The undersigned finds GF9 has not carried its burden of demonstrating a likelihood of success on the merits at this stage.

Importantly, GF9 does not contest that the breaches occurred or that by its terms, the MLA may be terminated due to the alleged breaches. GF9 also does not refute that it is responsible for the conduct of its subcontractors; that the MLA requires GF9's translated products be presented "in a quality manner and position befitting the end consumer expectation and experience (for example, with respect to packaging stock, presentation and customer service for damaged or returned product)" (MLA at 4); that the MLA requires all licensed products to "be of acceptable quality that satisfies consumer expectations, making them merchantable and fit for their intended and foreseeable uses" (MLA at 8); or that the MLA provides that all intellectual property rights in licensed materials, including translations, belong to Wizards.

Rather, GF9 argues that Wizards should be enjoined from terminating the MLA because the breaches identified in the Notice of Breach have either been rectified or relate to issues for which GF9 had no contractual obligations. For example, GF9 argues that it "had no contractual obligation" to address the BBE "packaging scheme" because it "was not part of the materials BBE was translating or distributing in the French market for GF9," but that it instead voluntarily "sought to have the Heros & Dragons products removed from the market." Dkt. 4, pp. 3-4. At the same time however, GF9 recognizes that BBE continues to infringe Wizards' intellectual property rights, and it continues to offer for sale products copying Wizards' copyrighted content, trademarks, and trade dress. Dkt. 4, p. 15 ("in or about August 2019 BBE did develop

REPORT AND RECOMMENDATION - 10

promotional packaging for its Heros & Dragons product that resembled the original red Dungeons & Dragons packaging"); Dkt. 20, Barrett Decl. ¶ 21 (Heros & Dragons products currently available for sale at http://www.black-book-editions.fr/catalogue.php?id=365).

Wizards has provided evidence that BBE's products use Wizards' textual content, as well as its visuals, and mimic authentic Dungeons & Dragons products in a blatant attempt to falsely associate with the real thing. *Id.* GF9 does not dispute that this intellectual property belongs to Wizards. Regardless of whether GF9 has terminated its relationship with BBE (Dkt. 4, p. 12), Wizards contends that GF9 is still responsible for BBE's infringement that took place during GF9's contractual relationship with BBE.

As to TRPG Club, GF9 claims to have "rectified that breach by explicitly following the direction from Wizards" to not submit any additional TRPG Club products for approval. Dkt. 12. Wizards argues that it is not enough that GF9 did not submit additional TRPG Club translations for Wizards to approve because under the terms of the MLA, GF9 remains primarily obligated for all responsibilities even those assigned to its subcontractors, and GF9 should have assured that no further substandard products remained on the market in South Korea. Although GF9 admitted that the merchandise produced by TRPG Club was poorly translated and low quality, it failed to propose any solutions to the problems created by TRPG Club created and instead, GF9 told Wizards that it could not work with TRPG Club. Dkt. 19, Earp Decl. ¶ 11.[3]

---

[3] Wizard also notes that, regardless of whether the breach caused by TRPG Club's conduct is curable, Wizards gave GF9 the opportunity to attempt to cure by providing the requisite notice and opportunity to do so, as Washington law requires. S*ee DC Farms, LLC v. Conagra Foods Lamb Weston, Inc.*, 179 Wash. App. 205, 223-26 (2014) ("if the party who seeks to terminate the contract truly believes that the default cannot be cured, then giving notice—with the result that any steps actually taken and proposals actually made will be in evidence—will produce a more reliable and thereby fairer basis for deciding whether the breach was curable").

REPORT AND RECOMMENDATION - 11

Based on the foregoing, the Court cannot conclude that GF9 has established that the breaches alleged by Wizards are without merit. At best, GF9's Complaint presents "serious questions going to the merits," not a likelihood that GF9 will succeed on the merits. *See All. for the Wild Rockies*, 632 F.3d at 1131. Such a showing on the merits element supports preliminary relief only if "a hardship balance [] tips sharply toward the plaintiff," and the other two *Winter* elements are fulfilled. *Id*. at 1132. Because GF9 cannot meet this standard with respect to the other elements, its showing with respect to the merits element is not enough to sustain a temporary restraining order. *See also*, *Int'l Molders' and Allied Workers' Local Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986) (internal citations omitted) ("In deciding a motion for a preliminary injunction, the district court is not bound to decide doubtful and difficult questions of law or disputed questions of fact.")

C.   Balance of Equities

The "balance of equities" prong requires the Court to "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation & internal quotation marks omitted). GF9 asserts that while it will suffer irreparable harm, Wizards will not because under the temporary restraining order requested, Wizards' benefits under the contract will continue. However, as previously discussed, GF9 has demonstrated only monetary loss. Although it argues that it seeks only to maintain the status quo, the relief it requests requires judicial intervention in a private contract dispute. Moreover, Wizards contends that its business is harmed every day that its relationship with GF9 continues as Wizards' products in the international market will continue to be of sub-par quality and the risk increases that GF9's other international subcontractors will infringe Wizards' trademarks and copyrights.

For these reasons, the Court finds that the balance of equities does not favor GF9.

D.   Public Interest

While the public generally has an interest in holding parties to contractual obligations (*see e.g.*, *Flex-Plan Servs., Inc. v. Evolution1, Inc.*, Case No. C13-1986-JCC, 2013 WL 12092543, at *8 (W.D. Wash. 2020), the "public interest is not directly implicated in [a] private party dispute over private contract and business rights ... [the public interest] is best served by a decision on the merits after trial ..." *Tiger Century Aircraft v. Calspan Corp.*, No. 1:09-CV-0317 OWW GS, 2009 WL 3486360, at *3 (E.D. Cal. Oct. 23, 2009). *See also*, *Goldberg v. Barreca*, 2017 WL 3478431, at *3 (D. Nev. Aug. 10, 2017) ("The public interest is adequately served in this instance by the plaintiffs' purported right to pursue its claims against the defendants in the regular course of civil litigation. In contrast, the public interest in this case would be breached by this court's drastic intervention in private enterprise on the unsubstantiated allegations of plaintiffs.")

GF9 argues that the lack of a temporary restraining order will harm the public because "the market will be [temporarily] lacking in product." Dkt. 4, p. 17. However, GF9 provides no reasonable basis for the Court to presume that Wizards, as the owner of the intellectual property in the licensed products, could not otherwise bring its products to market.

This factor does not favor GF9 as the public interest is not meaningfully implicated by the contractual dispute between these parties and denying the extraordinary relief requested by GF9 does not undermine the public interest in holding parties to contractual obligations.

## IV.  CONCLUSION

This action involves disputes over a private contract, the breach of which would be compensable by money damages. GF9 has failed to demonstrate several required elements

necessary for this Court's extraordinary equitable intervention in the form of a preliminary injunction. Accordingly, the Court recommends denying GF9's motion for temporary restraining order (Dkt. 4).

## OBJECTIONS AND APPEAL

This Report and Recommendation is not an appealable order. Therefore, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge enters a judgment in the case.

Given the expedited nature of the motion and relief sought, the Court finds that the deadline for filing objections, if any, to this Report and Recommendation, **shall be accelerated**. Objections may be filed and served upon all parties no later than **Monday, November 30, 2020**. The Clerk should note the matter for **Wednesday, December 2, 2020**, as ready for the District Judge's consideration if no objection is filed. If objections are filed, any response is due within 14 days after being served with the objections. A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served. The matter will then be ready for the Court's consideration on the date the response is due. Objections and responses shall not exceed five (5) pages. The failure to timely object may affect the right to appeal.

DATED this 25th day of November, 2020.

_____
BRIAN A. TSUCHIDA
Chief United States Magistrate Judge